Your Honor, the third case of the morning called 208-1091, Case Equipment Leasing Inc. v. Logical Investment Corp. at Ball. On behalf of the appellant, Mr. Steven T. Mann. On behalf of the athlete, Mr. William J. Hurley III. Mr. Mann? May it please the court. Good morning. My name is Steve Mann. I am counsel for the appellants this morning. Logical Investments, David Norma James Helen Minnis and Chapter 7 Trustee Michael Berland. Logical Investments, an Illinois corporation entered an agreement with Bank One Leasing in the year 2000 for purchase of equipment to be used in hair salons both in Oswego, Illinois and Naperville, Illinois. Sometime in 2003, Logical Investments allegedly failed to make required payments under this particular agreement. As a result, Bank One Leasing, which is now Chase Equipment Leasing, filed a complaint against Logical Investments and the guarantors to the agreement. You said allegedly. I mean, there's no dispute that they didn't pay them. There's no dispute on that. I mean, isn't that established in the record? They conceded that, right? The appellants admitted that they did not make the required payments. Okay. Before this complaint was filed, Your Honor, Lee Spiker, an agent for Bank One and A, corresponded with one of the guarantors, David Minnis, in working a potential sale of the equipment, initially stating the value of the equipment to be around $21,000. This is found in the record at $2299. After the sale of this equipment of about $5,000, an amount never credited to the guarantors in the final judgment of this case, a notice was provided to Logical Investments, David and Norma Minnis, of default. Let me interrupt you for a second. You said there was correspondence and you pointed to a particular patient record saying the equipment was valued at about $21,000. And then I lost you a little bit. You said it was then sold for only $5,000, or what did you say? That is correct. That is correct. It was sold for only $5,000, and even the $5,000 was not credited to these folks. Is that what you said? That is what I'm saying, Your Honor. Okay. Go ahead. There was a notice after that $5,000 sale. A notice was provided of default to Logical Investments. I'm sorry, one other question. Who conducted the sale? The sale was conducted between Bank One Leasing and… Minnis' family members conducted the sale. That's correct. That's correct, Your Honor. Mr. Minnis, David Minnis, was involved in negotiating the sale. The sale eventually was – the equipment was eventually sold to a landlord. Mr. Minnis was a landlord to a gentleman by the name of Bill Winais. The ultimate bill of sale, the ultimate contract, was ultimately signed between this William Winais and Bank One Leasing for $5,000. Okay, so I'm trying to find out what your point is here. Is it the position of the Minnis side of this case that the $5,000 – first of all, obviously, it shouldn't have been credited to them. Secondly, that the $5,000 was a deficient amount and that it was the bank's fault, the leasing company's fault, or Bank One Leasing's fault, that it was only – they only recouped $5,000 versus $21,000? No. Well, that's not our point, Your Honor. My point – McClellan's point is more front and center to the issue of notice. There were two of the Minnis's, David and Norma, that were involved. David, in particular, was involved in the sale. The problem that occurred was, if this ends up being Article 9, which was never determined at the trial court, that two of the guarantors of this agreement, the parents, Helen and James, were never made aware of this particular sale. They never had a chance – and as a result, they never had a chance to determine whether that particular sale, that $5,000, was actually commercially reasonable. Well, do you represent them? I do, Your Honor. Well, that was my question. I guess – I'm not sure I understood your answer before. I asked whether or not – let me put it this way, are any of the Minnis's, if I pronounced that plurally correctly, complaining that the $5,000 was an inadequate amount and that that is the fault of somebody, either Chase or Bank One, or are they saying it's the fault of their co-defendants? The Helens that were aware of the sale, David and Norma, are not making that contention. It is the parents who never received notice of the sale in the first place, never had an opportunity to get involved in that particular transaction, that are objecting to that amount. That's correct. So they are objecting to that amount. Yes. They say because they didn't get notice, they think they have standing or a position they can complain that $5,000 was inadequate. Right. They're seeking, Your Honor, protection under the rebuttal presumption stating that they never waived notice of this particular sale post-default, and as a result, the sale should have been the amount of outstanding deficiency. So is there some kind of conflict between the parties and the family members on this one side of the case? I'm not going to concede that there was a conflict. All the parties were represented, however, by the law firm of Ruddy Milroy King, and in this court this morning, I am representing all the appellants. Okay, go ahead. Along with this agreement, the bank also filed UCC filings for the equipment with the State of Illinois and renewed that filing in 2005, two years after the sale of the equipment, as we were discussing, for the $5,000. All of these factors were brought to the trial court's attention in a pre-hearing memorandum before final judgment and made part of the record at C-2103. Section 18 of this particular agreement also states that this agreement is a secured financing agreement, regardless of any of the other provisions in the agreement. In our brief, we went through also the test that's laid out in a case called NOAC, it's a bankruptcy case, that looks at, it's attached to the appendix A-20, whether an agreement is an Article 2A lease or a secured transaction. It looks at facts like who bears the risk of damage, who's required to insure the underlying equipment, who pays the taxes, many of these factors which were exactly the same with this particular lease here. The bank, in an about face after the sale, in their complaint filed in 2003, treated the agreement as a lease for purposes of notice, charging the guarantors in the complaint for the outstanding rents due under the lease. Complicating matters further, in 2008, the bank moved for summary judgment on its complaint, stating that the agreement was subject to Article 3 of the UCC, usually reserved for negotiable instruments. After objection by the appellants as to the invalidity of that section to the agreement at hand, the bank simply argued that it was proving the agreement under 2-1005 and that the UCC not apply. Section 1103 comments to the UCC states that the UCC cannot, laws of law and equity, common law, may supplement provisions of the UCC, but they may not be used to supplant those provisions. This was an agreement between two businesses. Therefore, only UCC statutes apply. Also stating in the case of the McMahon v. Chicago Mercantile Exchange, any statutes in existence at the time of the contract become part of that contract. Now, the bank this morning will come and say that it's brief, and it's brief that the appellants admitted all salient points of the summary judgment. This is untrue. The appellants admitted in their answers to the bank complaint the authenticity of the agreement and the guarantee, but denied damages. Furthermore, in light of the fact that this instrument was actually a secured transaction, the bank failed to plead in action for a deficiency judgment against the guarantors. At least in the case of two guarantors, James and Helen, proper notice pursuant to Article 9 of the UCC was not had. One cannot admit or deny law and its requirements. Rather, as stated in the case of Rohde v. Rohde, judicial omissions are clear, unequivocal statements about facts. Both prior to the final judgment on the agreement and in post-judgments in both motions and hearings, the appellant informed the trial court that the bank had not met its burden in approving the case under the UCC, either potentially under Article 2A or Article 9. Furthermore, the argument was made that attorneys' fees and costs were not being calculated correctly. When it came time to prove damages, the bank moved, and the court affirmed, by tendering an affidavit of a bank officer, J.P. Morgan Chase, Pamela Crawford. Ms. Crawford totaled the principal amount due, essentially the remaining rents due on this particular lease, and then leveled the guarantors with an interest rate of about 18.25 percent, continuing until the time of the judgment and well past the end date on the lease. The resultant recovery for the bank of about $122,000 on equipment valued at $68,000. And keep in mind that at the time of the default, the logical investments had already paid about $54,000 on this particular lease. Attorneys' fees and costs were awarded about $64,000 for the collection of an outstanding $33,000 on the complaint. The danger in not requiring the bank to plead under the appropriate section of the UCC manifested itself in two major ways. First, it denied the guarantors certain protections under the UCC, particularly regarding notice. And in the case of Article 2A, if indeed that section does apply, the requirement that liquidated clause damages be reasonable in light of the anticipated harm. That's under Section 2A504 UCC. The second thing it did is it subjected the guarantors to a greater degree of risk and ambiguity than had been contemplated at signing. Although guarantors had waived pre-default notice of sale, the UCC states that notice of sale of collateral post-default cannot be waived under Section 9-624. As this did not occur, particularly for the guarantors, James and Helen Minnis, a rebuttable presumption exists that the sale of the collateral sold was equal to the outstanding deficiency, citing the case of Executive Communication Services v. Vapor. In the context of Article 9, once the secured collateral had been sold and applied in accordance with the guidelines set forth in Section 608, what remains is a deficiency judgment, which is a certain amount. The bank will point to its remedy clause in this particular agreement as proof of a contract of liquidated damages. However, this provision serves little purpose when it's pointed out in the case of Browns v. Combs the damages are otherwise ascertainable. This remedy section only serves to pile on additional damages, which are not reasonable in light of the anticipated harm. In the case of Enrolled Bank v. First Class Diagnostics, which is actually attached to our brief in the appendix at 824, the Court found that an open-ended provision which allowed all outstanding rents of a lease with an ongoing overdue rate accrual reason enough to deny summary judgment and set aside the issue of damages for hearing to determine the appropriate interpretation of terms as well as whether the liquidated damages clause was an unenforceable penalty in light of the disproportionate loss. When the legal nature of an agreement is in question, this also affects the guarantors to that agreement. Guarantors in Illinois are not liable for anything that they did not agree to. And if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guarantee, the guarantor will be released. Exchange National Bank v. Bergen. A guarantee requires a meeting of the mind. In this case, all guarantors found themselves liable to a remedies provision, a liquidation provision that conflicted with the plain language of this particular instrument. That is in Section 18 of the agreement that regardless of any other provision of this agreement, this particular agreement was a secured financing agreement. In turning finally to attorney's fees and costs awarded the bank, much of this particular appeal discusses the trial record and transcript of proceedings which occurred in 2008. This case was filed in 2003 along with the sister case in Kendall County with many similar issues concerning damages also currently on appeal in this reviewing court. Although I will not discuss the legal merits of self claims filed by the appellants, it's important to note that all of these claims related to a completely separate issue. It was a separate home equity loan breach issue between the bank and David Metz. And it also dealt with an unrelease of a mortgage on a separate agreement. At a certain point. They have criticized your argument on that point saying that what you just said now, separating that home mortgage and its release and all that, that was the basis of your lawsuit below. And this case was that they had improperly not released the mortgage and if they had, they could have gotten this home equity loan and paid this $33,000. Wasn't that the heart of your case in this case in the trial court? The heart of the case between the mortgage lien that was unreleased. No, the heart of the case, this case we're on right now. In the trial court on this case, you pointed to the other case and pointed to the other situation and said, hey, if they had just given us the home equity loan, we could have paid this loan. And they improperly didn't give us the home equity loan. Now you're saying that home equity loan was completely unrelated. But it was the heart of your case here, according to them. The home equity loan, Your Honor, getting into the merits of that particular claim, was to be used for remodeling. Part of it was going to be used for remodeling of their house. That's not my question. Their position is that the heart of your defense, the guarantor's defense here, was that they would have never been called upon to defend anything because it would have been paid if the home equity loan had been achieved. That it was improperly not given, the home equity loan. The home equity loan breach was a separate contract. We never know what would have happened with those particular proceeds because it never funded. But they're telling us, and they're going to get up here now and tell us, you didn't say that in the trial court. That's what they're going to tell us. You didn't say that in the trial court. In the trial court you said, hey, if we had gotten this home equity loan, we would have paid this off, we would have been able to pay it off, and we wouldn't have had these problems. And then you reversed course, and the trial court saw it that way. The trial court said that you reversed positions as this thing progressed. Those are your problems here, and that's what you haven't addressed. Well, Your Honor, going back to that actual counterclaims itself, the way it was pled, it was basically pled as a separate breach of contract issue. It dealt with a loan. It was a personal loan between David Minnis rather than in the business here between Logical Investments. Well, it was a home equity loan. It was a home equity loan to be used for. So you're saying now that this home equity loan had nothing to do with paying off this deficiency? Just so I'm clear. As pled, Your Honor, it was pled as a counterclaim separately as a breach. That is correct. So other than similar parties, these cases have nothing to do with each other? They're similar parties in the sense that that's correct. David Minnis went in at a separate occasion outside of the realm of this business, Logical Investments, to seek a home equity loan. All right. Counsel, your bell just rang. If you want to wrap up here real quickly on the point, you may do that, and then you'll have time for a rebuttal. Okay. Thank you, Your Honor. I just quickly wanted to state, you know, the case of Kaiser v. Olson, dealing with the cost of attorney fee collection was the exact same provision that was here in this lease. These matters, the home equity matter, mortgage act, mortgage lien matters, that were incidental to the actual collection of this lease. So then in closing, we ask this court to reverse the trial court's granted summary judgment and remand the case for further proceedings on liability and damages. Thank you. Let me finish that with two questions. When it began, not in the beginning, I guess, when things went awry here, it was a $33,000 problem, and it's ballooned now into how much? It's ballooned with attorneys fees? Yeah. Well, I think the judgment eventually came to around $130,000, $124,000. And that doesn't even count the money that these people that are now having been lost below had to pay you. I mean, I'm not asking what that amount is. Below as far as the – for purposes of the appeal, Your Honor. Yeah, no, I mean, I'm just talking – I just wanted to get kind of a big picture here. Somebody owed $30,000, and now they owe $120,000 plus whatever they paid to fight to get to that position. I just wanted to make sure I understood how big – a big picture thing. You can sit down now, and then you can come back at the end. I'm not looking for any further response on that. Thank you. Sure. Okay. All right. Counsel for the appellees, please. Your Honor, good morning. William J. Hurley for the Appellee Chase Equipment Leasing, Inc. Your Honor, I think that the last point raised is of really significant import here because counsel pled as affirmative defense is not counterclaims in this case. They pled this failure to make a loan issue which allegedly took place by their own verified pleadings between Chase Bank – not Chase Equipment Leasing, but between Chase Bank and the Meneses. Which Meneses? Well, they joined all the Meneses in that claim, Your Honor. They joined Logical in those affirmative defenses. They pled the claim in the separate action against Chase Bank as affirmative defenses, in this case, virtually verbatim. They did not seek any relief against Chase Equipment Leasing in those affirmative defenses. They raised those affirmative defenses three separate times as recently as their second amended affirmative defenses. And that was the point of my perhaps indignation, which may have come through in the record and in my brief, is that for them to have asserted these affirmative defenses as a bar to this claim by Chase Equipment Leasing, not the bank, Chase Equipment Leasing, and now to say that they have nothing to do with this claim, that the case in chief is just, I believe, a stunning admission. They never should have been pled in the first place. And this whole issue about this loan that should or should not have been made, whatever the case may be between Chase Bank and the Meneses, has absolutely no relevance and no import to the claim at hand. And they have finally admitted that. They have finally admitted that after five-plus years of litigation. And the Court noted that the sums included in the judgment were substantially more than the $36,000 that may have initially been at issue, Your Honor. So your position is Bank One and Bank One Leasing were two separate and distinct entities? Absolutely. Absolutely. And they never pled an alter ego theory, Your Honor. They never pled that. They raised it in some motions inferentially, but they never pled it and they never asserted it. They never asserted alter ego and they never asserted piercing corporate veil. None of those issues were raised in an affirmative defense against my claim. Did they not assert that it was operating out of the same place, that they had the same employees, et cetera, et cetera? Your Honor, there are assertions to that effect, yes. But the Supreme Court case I cited in the name that escapes me at the moment makes it clear that these incidental facts do not create a piercing of the corporate veil, the prima facie case of piercing the corporate veil. And, again, it was incumbent on them to raise this affirmatively, judge in a pleading. It wasn't raised until after the summary judgment motion was briefed and after the Court had issued its decision, the memorandum that counsel refers to. He filed that sua sponte without leave of court, without having an order granting him leave to do so. Sent it directly to the trial judge two days before the reconvened hearing on the amount of interest. The amount of interest was the only thing that was left at issue in that July 30th hearing. That's clearly what the judge's order said. And the judge reconvened that hearing simply so that I could provide the Court with an interest computation based on $17.90 per day per diem, which, even though I disagreed with, for purposes of the summary judgment, we were willing to accept the defendant's number on that. Counsel, hold that thought for a second, because you're going away from something I wanted to clarify here. Certainly. I want you to come back to that. In response to the question you've talked about, a little bit about the relationship between these corporate entities, the piercing of the corporate veil, alter ego, shared employees, shared office space, if I understand correctly, though, your current position is that all of that is moot by their most recent position, which is that that is a completely separate situation. I think that's a reasonable conclusion to draw from his statements and their brief, Your Honor. I believe that's true. I mean, there's a lot that's been said about all that stuff, but that seemed to be where you were coming from at the end here, which is that all of the time that was spent on those issues, given their most recent position, which I just talked to him about, there's no matter anymore. I don't think so. But I will be candid with you. I've become cautious, given the history of the litigation, and just assuming that something is over, because they've said it's over. There have been reversals in position before, Your Honor. And I think that this latest reversal is just the most stunning example of that issue. Okay. You were on the per diem when I interrupted you. You can go back to that or wherever you want to go. Sure. So, Your Honor, if you look at the motion for summary judgment, and the motion for summary judgment was based on the answer that they had filed. One of the admissions in their answer, they admitted that under the terms of the lease, logical investments was to have made monthly payments of $1,467.10 for a period of 60 months. They admitted that. Each of the guarantors admitted that. That's the damages issue, Judge. They admitted that. And there's really no controversy involved whatsoever in that admission. They admitted the authenticity of the documents. They admitted signing the documents. The documents themselves provide for interest on the amounts due. We agreed to accept their interest number. So no question of fact exists as to the interest that should have been applied to the outstanding sums due. As to the attorney's fees, Your Honor, again, counsel complained about the fact that the fees were ramped up by my pleadings, by my actions addressing their various claims. There were a substantial number of fees requested. And those fees, Your Honor, were incurred to a very substantial degree by having to deal with the affirmative defenses and the non-affirmative defenses that counsel now says are not relevant to this case. Under those circumstances, I had to get through those affirmative defenses before I could move for summary judgment on my complaint. I understood that summary affirmative defenses are pled in power of a cause of action. It was necessary for me to do that in order to enforce my guarantee, or my client's guarantee, rather, and I think it's under the circumstances entirely appropriate that the trial court would have granted those attorney's fees as part of the judgment that was entered in this cause. This business about the sale of the collateral is disturbing. It's disturbing because the sale of this collateral was not requested by Chase Equipment. The sale of the collateral came about because Mr. Minnis and his landlord, Mr. Bonillas, were evidently in a dispute of some kind. Which Minnis? Again, Your Honor, if you look at their pleadings, they have always styled themselves as the Minnis family. They have not identified or distinguished between David, Norma, James, or Helen, or even logical for that matter. But they are today. They appear to be trying to do so. Okay. The, this equipment, this was, the vernacular hadn't been invented yet, but what happened here was a short sale. That's a concept which has become, unfortunately, very common these days when their collateral does not adequately secure a debt. And that's what happened here. Mr. Minnis came to my client and said, What is the least you will release your lien for so that we don't lose everything we've got to this dispute with our landlord? This was not a UCC sale. This was not a sale by a secured creditor. The authority provided by Midwest Bank makes it clear that this type of situation does not dictate notices which would traditionally be required in a collateral sale by a secured creditor. Notices of that type are not required. And I think Midwest Bank says it very articulately when they say there's no basis in the statute for expanded application proposed by the defendants, and we cannot apply the statutory notice requirement to a secured creditor who did not actually make the sale, but merely consented to a debtor's sale of the collateral and then applied the proceeds of that sale to the outstanding loan. That is what happened here. That is what happened here. Now, counsel raises the question, Well, it wasn't applied. He didn't raise that issue until after the summary judgment had been briefed, heard, and argued in this memorandum, which, again, has been file stamped, but I don't know that it's part of the record because it was never, lien was never granted to file it, and it was never filed. Was it ever applied? Yes, it was, Judge. There are attachments to the pleadings, and the counsel brought a motion to vacate the judgment after the judgment was honored, and he raised some of these issues. And attached to his pleadings was a copy of a loan history which didn't bear a bait stamp. That document, that loan history, was provided to them as evidenced by the bait stamp copy that was attached to my reply or response, rather, to the motion for summary judgment. Motion to vacate. Vacate. So, yes, it was. What do you make of counsel made an argument that there was some agreement between Bank One and the ministers regarding the sale of the property at the amount of $21,000? I didn't understand that argument, Judge. I think the question was what the collateral was worth, blue book value, if you will. What was it worth? And I think that is the question that my client responded to. Mr. Minnis, in turn, says, what's the least you will get, what's the least you will release your lien for on this collateral? And the number of $5,000 came from them. It doesn't come from us, Your Honor. So my client now, they're effectively seeking to penalize my client for acquiescing to a plea to help them save their business, a plea to help them save their business to acquiesce and release their lien on this equipment, which they did, and they executed the bill of sale because the title had not been passed two minutes. That doesn't mean it was a sale by Chase Equipment. The sale was negotiated and completed by the defendants. That was merely the last step needed to complete the change. We were not a party to any agreement with what happened. His position is that the agreement was between James and Helen and not David and Norm. Again, I have to fall back on Midwest Bank for the proposition that what these people did between themselves, I don't know. Okay? There's obviously a familial relationship there. What is clear is that Chase Equipment did not conduct a UCC sale of the equipment and, therefore, those provisions that may be required under the Act are not triggered, and I believe Midwest upholds that. But didn't they release the lien for $5,000 without discussing that with David and Norma but accepting that on the representation of James and Helen? What's your response to that? Because I think that's what he's arguing today. Well, that may be what his argument is, but the guarantee signed by James and Helen, assuming this conversation did not take place, the guarantee that James and Helen signed, which, by the way, is the same guarantee that David and Norma signed, expressly gives the bank the authority to do that, to deal with the collateral to issue releases, and they consent to that. So counsel, again, did not raise this bifurcation of interest, if you will, until after the summary judgment and very belatedly in his oral argument on, I believe it was the motion to vacate. And, again, it was stunning. It was stunning to me because just looking at their pleadings, you'll see that throughout this whole thing, it's always been the Minnis family, the Minnis family. What did David and Norma talk to James and Helen about? I don't know. They didn't proffer any affidavit of record to the extent that there were conversations there. Well, but if what Chase did or Bank One was release the lien, then that's all they did. They no longer had a lien, so then the property belonged to whoever belonged to it. That didn't result in transferring the property to this landlord. Well, it would be correct, yes. I'm not quite sure why there was, if indeed counsel is correct, that there was a bill. I don't understand the point of the law. I guess what I'm saying is that, I mean, to release, for the bank to release, for the creditor, whoever loaned the money to release its lien, that's, the title goes to the, and then it's affected. Okay. Yeah, I think it's affected between the parties, the Bonaeses and the Minnis. With respect to a deficiency in the sale, the short sale, if you will. I'm sorry, Your Honor. It affects them in the short sale, if you will. Well, certainly the proceeds from the collateral, the amount of the proceeds from the sale, from the short sale of the collateral affects the balance that's due under the agreement. I think there's certainly no doubt about that. And that's certainly what the Minnis has agreed to. Okay. I don't see that there was any dispute about that raised at all in the pleadings, Your Honor. And I think Judge McCann had it right when he said that. There's a lot of Monday morning quarterbacking going on here. Issues were not presented. Issues were not raised. Things were filed without leave of court. The opportunity to have raised these was either affirmatively in their pleadings, which they didn't do, or in response to the motions for summary judgment, which, again, they didn't do. And under the circumstances, Your Honor, I don't believe there's any question of fact in light of the admissions contained in the record by the Minnis'. I don't see there's any overreaching or unfairness whatsoever that's attended this case. All right, Counselor, if your time is up, anything else you want to add real quickly? I'm sure I could go on for at least another half an hour. That's why I phrased it as I did. Thank you for your argument, let me put it that way. Yes, sir. I just want to, well, the court's got the concept that we're not the bank. I think that concept has been clearly communicated. So with that, I will thank you for your time. And we vote from the defendants, please. Thank you. The issue, the main issue that we raise is that there is a serious question of law here. The fact that no section of the UCC was even mentioned until the motion for summary judgment and that after that motion for summary judgment quoted Article 3, and we brought up Articles 2A and Article 9, we shouldn't be punished because during the motions for summary judgment proceedings, we objected to the fact that the UCC was not being applied at all, and if it was, it was being applied in the wrong way, and how to go about applying it. Now, as far as the protection of the guarantee, the guarantors, James and Helen Minnis, here is the issue. They never waived sale of that particular collateral post the fall. The notice requirement under the UCC is there specifically to alleviate the types of issues that counsel just discussed, whether or not these were family members that were talking to each other  What about the case he points to that does say very clearly that it wasn't, if it's not a sale conducted by them, they don't have any obligation to give those to anybody. But it was a sale that was involved, the bank was involved. The bank was involved to the point where, according to him, the record will show, that the bank's involvement was limited to saying we will release our lien for X amount, and they did in fact release their lien for X amount. For sure, the lien, that particular lien was never released. The UCC filing was continued and renewed in 2005. That's actually part of the record. The lien was never released. It was a $5,000 sale. All right, the lien was never released, and how can half the Minnis family be complaining about, what are they complaining about? The sale didn't have any effect, the bank still had its lien. The Minnis family is complaining about the fact that, the two guarantors are complaining about the fact that they were not made aware of the $5,000 amount of that sale of that collateral. They did not receive notice of that particular sale. But there was no release of the lien based on that sale you're saying? We later found out upon research that there was no release of that particular lien. So how were they hurt then? I mean, the property was sold, but the bank retained its lien, you said. So that means that this landlord who got the property has got it subject to the bank's lien, and so the family members through the bank still own the property then. I know that's not exactly right, but... The guarantors, James and Helen, are in this action today. I'm sorry? The guarantors, James and Helen, have specific complaints in this action today. The bank is alleging damages against them for $33,000, well, originally. But they didn't go right back to the... They should have gone into trial court and said, hey, listen, first of all, they got a lien, let them exercise for whatever they have to do, foreclosure, whatever the term would be on their lien, because they haven't released it. I don't understand how that could have happened, that the property would end up in the hands of the landlord if the bank never released its lien. I don't either, Your Honor. That's what their record would show. That is exactly what the record would show. But I'm not sure what these other folks are complaining about then, because they're complaining about not receiving notification of something that never resulted in anything, that never resulted in the release of the lien anyway. Well, it resulted in a sale of $5,000. Ultimately, after that particular sale, the bank moved over. But what was actually sold? I mean, they took the property subject to the lien. Your Honor, we don't know. We were never given the opportunity to go further into discovery on the particulars of that particular deal, which is precisely why we're saying the motion for summary judgment should have never been granted in the first place. Your Honor, the bank gets into, I just want to briefly get back to the point regarding bank loan leasing and the counterclaims. Although they were stated to be labeled affirmative offenses, in essence, these were counterclaims that actually survived motions for summary judgments filed back in 2005 in this particular case. What happened was the bank did bring up the point that we were pleading these counterclaims against Bank One. Our comment in filing a motion to consolidate, we actually stated that. And the bank, as well, had been responding to discovery requests. Bank One Leasing was actually responding to pleadings of discovery requests relating to the other bank. They were the same agents involved. But what does that matter now that your position now is that it's a completely separate transaction? Who cares if they are? If it's the same, it's established that it is the same entity. If its establishment is the same entity, Your Honor, in essence, Bank One, which is what it was pled against, that those counterclaims would serve as set-offs against both actions. That's why we filed a motion to consolidate. Any other case? Oh, okay, okay. Both cases, correct. All right, any final thoughts there, Your Honor? Your Honor, the only other thing I wanted to mention about the issue of motion to consolidate and the attorney's fees was the fact that when it came to attorney's fees, both cases were consolidated into the same fees. They were actually redacted, did a half-retroactive look at it, and we had to disseminate it. It's one of the reasons why the motion to consolidate probably should have been granted, because these two cases were basically treated the same throughout. Wait a minute, did you say the motion to consolidate should have been granted or was granted? It was not granted, Your Honor. Okay. What ended up resulting was exactly what happened here with the attorney's fees. We got a merged fee redacted that we were unable to cross-examine. Deprocessed, basically. We weren't able to cross-examine what was applied in one case or the other. Thank you. Okay, thank you for your argument, Mr. Post-Gentleman.